# In the United States Court of Appeals
# for the Eleventh Circuit

---

YVONNE WEST,

*Plaintiff/Appellant,*

v.

DEKALB COUNTY, GEORGIA, et al.,

*Defendants/Appellees.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Civil Action No. 1:23-CV-01907-LMM**

---

**REPLY BRIEF OF APPELLANTS**

---

Leighton Moore
Georgia Bar No. 520701
THE MOORE LAW FIRM, PC
1819 Peachtree Street NE
Suite 403
Atlanta, GA 30309
Phone: 404-285-5724
leighton@moorefirmpc.com

**CERTIFICATE OF INTERESTED PERSONS**

The following is a list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

Bozeman, Robert O. (Attorney)

Britt, Russel A. (Attorney)

Burton, Joshua (Appellee)

Davis, Mawuli Mel (Attorney)

The Davis Bozeman Law Firm, PC

DeKalb County, Georgia (Appellee)

Ditmore, Phillip (Appellee)

Fite, Elizabeth L. (Attorney)

Fleming, Kevin (Appellee)

May, Hon. Leigh Martin (USDC Judge) Jones, C. (Appellee)

Kelly, David (Appellee)

Lakatos, Jonah (Appellee)

Lattimore, Timothy (Appellee)

Moore, Leighton (Attorney)

The Moore Law Firm, PC

Paxton, Deion (Appellee)

Payne, Tiffany (Appellee)

Spence, Harold W. (Attorney)

Van Wie, Melissa (Appellee)

Ware, R. David (Attorney)

West, Yvonne M. (Appellant)

Wiggins Law Group, LLC

Wiggins, Cary S. (Attorney)

Williams, M. (Appellee)

Williams, Brandon W. (Appellee)

Winkler, Jason (Appellee)

No publicly held corporation owns 10% or more of any party's stock.

This 14th day of May, 2025.

*s/ Leighton Moore*
Leighton Moore
Ga. Bar No. 520701
Attorney for Appellant

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS....................................................C-1

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES......................................................................ii

PRELIMINARY STATEMENT................................................................1

ARGUMENT AND CITATION OF AUTHORITY.................................................2

I.     Defendants' jurisdictional arguments are baseless.......................................2

II.    Plaintiff's ADA claims against DeKalb County should be upheld................8

III.   Plaintiff also pleads valid claims under Section 1983. ................................19

CONCLUSION.....................................................................................25

CERTIFICATE OF COMPLIANCE......................................................................27

CERTIFICATE OF SERVICE................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate*,
469 U.S. 287, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) ................................. 9

*Amiri v. Gupta*,
No. 21-13301, 2022 U.S. App. LEXIS 24293 (11th Cir. Aug. 29, 2022) ........................................................................................................ 7

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
953 F.3d 707, 725 (11th Cir. 2020) ................................................................ 4-7

*Burlison v. United States AG*,
471 F. App'x 878, 879 (11th Cir. 2012) ......................................................... 4

*Betty Wade v. Georgia Correctional Health, LLC, et al.*,
Appeal No. 21-14275 ...................................................................................... 22

*Bircoll v. Miami-Dade Cty.*,
480 F.3d 1072 (11th Cir. 2007) ....................................................................... 9

*Bozeman v. Orum*,
422 F.3d 1265 (11th Cir. 2005) ....................................................................... 24

*Bragdon* v. *Abbott*,
524 U.S. 624 (1998) ......................................................................................... 9

*Conley v. Gibson*,
355 U.S. 41, 48, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) ............................. 8

*Cottrell v. Caldwell*,
85 F.3d 1480 (11th Cir. 1996) ......................................................................... 20-23

*Doe v. Sch. Bd. of Broward Cty., Fla.*,
604 F.3d 1248 (11th Cir. 2010) ....................................................................... 14

*Farmer v. Brennan*,
511 U.S. 825 (1994) ......................................................................................... 15

*Favors v. City of Atlanta*,
849 Fed. Appx. 813 (2021) .............................................................................. 15

*Foman v. Davis*,
371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ..................................... 8

*Garrett v. Athens-Clarke Cnty.*,
    378 F.3d 1274 (11th Cir. 2004) .............................................................. 21-23

*Gen. Star Indem. Co. v. Triumph Hous. Mgmt., LLC*
    855 F. App'x 599 (11th Cir. 2021)........................................................... 4, 7

*Gold v. City of Miami*,
    151 F.3d 1346 (11th Cir. 1998) .................................................................. 15

*Hainze v. Richards*,
    207 F.3d 795 (2000) .............................................................................. 11-12

*Ingram v. Kubik*,
    30 F.4th 1241 (11th Cir. 2022)................................................................... 24

*J.S. v. Hous. Cty. Bd. of Educ.*,
    877 F.3d 979, 27 Fla. L. Weekly Fed. C 791 (11th Cir. 2017) ... 19, 28, 29, 31

*Jenkins v. Woodard*,
    109 F.4th 242, 246-47 (4th Cir. 2024). ...................................................... 7

*Liese v. Indian River Cty. Hosp. Dist.*,
    701 F.3d 334, 23 Fla. L. Weekly Fed. C 1668
    (11th Cir. 2012).................................................................................. *passim*

*Lombardo* v. *City of St. Louis*,
    141 S. Ct. 2239, 2241; 210 L.Ed.2d 609 (2021). ....................................... 24

*Molette v. Georgia*,
    469 F.App'x 766 (11th Cir. 2012) ............................................................... 4

*Phillips v. FedEx Ground Package Sys., Inc.*, No. 23-10005, 2024 U.S. App.
    LEXIS 6629 (11th Cir. Mar. 20, 2024). ................................................... 2, 6

*Osterneck v. E.T. Barwick Indus., Inc.*,
    825 F.2d 1521 (11th Cir. 1987)................................................................. 4-7

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206, 211, 118 S. Ct. 1952, 1955, 141 L.Ed.2d 215, 220
    (1998) ......................................................................................................... 11

*Seremeth v. Bd. of Cty. Comm'rs*,
    673 F.3d 333 (4th Cir. 2012) ..................................................................... 11

*Sheehan v. City and Cty. of San Francisco*,

    743 F.3d 1211 (9th Cir. 2014) ....................................................... 11

*Silberman v. Miami-Dade Transit*,

    927 F.3d 1123, 1135 (11th Cir. 2019) ........................................... 13

*Skrtich v. Thornton*,

    280 F.3d 1295, 1303-04 (11th Cir. 2002). .................................... 20

*Sunderland v. Bethesda Hosp., Inc.*,

    686 F. App'x 807, 816 (11th Cir. 2017). ...................................... 14

*United States v. Alston*,

    No. 21-12077, 2022 U.S. App. LEXIS 6315 (11th Cir. Mar. 9, 2022) ........... 6

*U.S. v. Georgia*,

    546 U.S. 151, 157 (2006). ............................................................ 10

*Valderrama v. Rousseau*,

    780 F.3d 1108 (11th Cir. 2015) ................................................... 24

*Vera v. Mkt. Wood LLC*,

    No. 22-14088, 2023 U.S. App. LEXIS 12707 (11th Cir. May 23, 2023) ...... 7

*Wade v. Daniels,*

    36 F.4th 1318 (11th Cir. 2022) .................................................... 24

*Windham v. Harris Cty.*,

    875 F.3d 229, 237-38 (5th Cir. 2017) .......................................... 11

## Statutes, Rules and Regulations

42 U.S.C. § 1983.................................................................................*passim*

42 U.S.C. §§ 12132-12133 ................................................................ 8

Federal Rule of Appellate Procedure 3 .............................................*passim*

## Other Authorities

"Positional Asphyxia — Sudden Death" (Nat'l Law Enf. Tech. Center, June 1995), https://www.ojp.gov/pdffiles/posasph.pdf (last viewed May 14, 2025). ......................................................................................... 20

# PRELIMINARY STATEMENT

Seeking to avoid this Court's review, Defendants attempt to argue that the Court lacks jurisdiction over most of the issues in the case due to technical criticisms of Plaintiff's notice of appeal. That argument ignores controlling decisions of this Court and the 2021 amendments to Federal Rule of Appellate Procedure 3.

Defendants' effort to stave off Plaintiff's ADA claims fares no better. They ask this Court to join the Fifth Circuit in the minority of a circuit split concerning whether Title II of the ADA applies to police carrying out an arrest; but this case involves an emergency medical response, not an arrest, because Jamon West was not suspected of any crime. Title II applies here, and required Defendants to make reasonable modifications of their policies and procedures to accommodate Jamon's disability. They failed to do so, despite (as Plaintiff alleges) having actual knowledge that such modifications were needed. Plaintiff's claims for deliberate indifference surpass the 12(b)(6) plausibility standard and should be upheld.

Plaintiff also asserts valid claims under Section 1983. Defendants' arguments that they did not use excessive force disregard Plaintiff's allegation that the restraint methods they used carried a substantial risk of death, and that they continued to use them the need for **any** force had passed. Plaintiff plausibly alleges that Ditmore and Payne, who not only assisted in the improper restraint but also gave Jamon chemical sedatives that reduced his ability to breathe, were deliberately indifferent in failing

to modify his restraint or even inform other officers that he was at risk. And DeKalb's argument that it cannot be held accountable for failing to train its officers on the risks of positional asphyxia ignores direct evidence that DeKalb policymakers were aware of those risks, as well as decades of guidance from relevant authorities, including the United States Department of Justice. Under no circumstances should twelve DeKalb County first responders, in 2019, have been ignorant of risks that federal law-enforcement guidance has warned about since 1995.

For the foregoing reasons, and as demonstrated further below, this Court should reverse the decision of the District Court and reinstate Plaintiff's claims.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Defendants' jurisdictional arguments are baseless.

Defendants argue that this Court lacks jurisdiction to review the interlocutory orders of the District Court that dismissed most of the Defendants, because Plaintiff did not specifically designate those Orders in her Notice of Appeal. This argument fails for at least two fundamental reasons.

First, Defendants' argument ignores the fact that "Rule 3 was amended in 2021, so that now a notice of appeal encompasses all orders that merge into the appealable order." *Phillips v. FedEx Ground Package Sys.*, *Inc.*, No. 23-10005, 2024 U.S. App. LEXIS 6629, at *5 (11th Cir. Mar. 20, 2024). As amended, Fed. R. App. P. 3(c)(4) states: "The notice of appeal encompasses all orders that, for purposes of

appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal." In a civil case such as this one, "a notice of appeal encompasses the final judgment . . . if the notice designates: an order that adjudicates all remaining claims and the rights and liabilities of all remaining parties . . .." Fed. R. App. P. 3(c)(5). An appellant may expressly state that the appeal is limited to only part of the judgment, but, "[w]ithout such an express statement, specific designations do not limit the scope of the notice of appeal." Fed. R. App. P. 3(c)(6). And "[a]n appeal must not be dismissed . . . for failure to properly designate the judgment if the notice of appeal was filed after entry of the judgment and designates an order that merged into that judgment." Fed. R. App. P. 3(c)(7).

The Advisory Committee on Appellate Rules explained that, among other things, the amendments were meant to solve the "problem [that] arises when a case is decided by a series of orders, sometimes separated by a year or more."

> For example, some claims might be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and then, after a considerable period for discovery, summary judgment under Fed. R. Civ. P. 56 is granted in favor of the defendant on the remaining claims. That second order, because it resolves all of the remaining claims, is a final judgment, and an appeal from that final judgment confers jurisdiction to review the earlier Fed. R. Civ. P. 12(b)(6) dismissal.

Fed. R. App. P. 3, Adv. Comm. Cmt. (2021). That is basically the situation here: some defendants were dismissed in the first Dismissal Order, and then the second Dismissal Order dismissed all remaining defendants and closed the case. The 2021

amendments provide that an appeal from that final judgment encompasses the prior dismissal orders. Fed. R. App. P. 3(c)(4); *see Gen. Star Indem. Co. v. Triumph Hous. Mgmt., LLC*, 855 F. App'x 599, 602 (11th Cir. 2021) (holding that, "because nonfinal orders dismissing some claims or parties merge into and become part of the final judgment, a notice of appeal from the final judgment encompasses those earlier nonfinal orders even if the notice of appeal does not mention them").

Second, even before these amendments, the cases on which Defendants rely were no longer good law. Defendants quote the 1987 case of *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1529 (11th Cir. 1987), and its mostly unpublished progeny such as *Molette v. Georgia*, 469 F.App'x 766, 767 (11th Cir. 2012), and *Burlison v. United States AG*, 471 F. App'x 878, 879 (11th Cir. 2012), for the proposition that the court "will not expand [a notice of appeal] to include judgments and orders not specified unless the overriding intent to appeal these orders is readily apparent on the face of the notice." Defendants fail to mention, however, that this Court later identified that language from *Osterneck* as *dicta*. *See Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 725 (11th Cir. 2020) ("Our statement about undesignated orders in *Osterneck* was not necessary to the decision we reached, so it is not part of our holding.").

In the *Auto Alignment* decision, which came down shortly **before** the 2021 amendments to Rule 3, this Court disapproved the *Osterneck* line of cases and held

that, "when a notice of appeal designates the final, appealable order—and does not identify specific parts of that order for appeal—we have jurisdiction to review that order and any earlier interlocutory orders that produced the judgment." *Auto Alignment*, 953 F.3d 707, 724-25. This Court held that the appellant's designation of "the final, appealable order that dismissed their remaining claims under state law" was sufficient to encompass in the appeal a prior "undesignated interlocutory order that dismissed their antitrust claims because that order was a step towards the final judgment into which it merged." *Id.* at 725 (cleaned up). Defendants ignore this.

Here, Plaintiff did with parties precisely what the appellant in *Auto Alignment* did with claims. The district court's first dismissal order dismissed less than all parties; its order after remand from this Court then dismissed the final defendant, Kevin Fleming, and directed the clerk to close the case. Doc. 83. As in *Auto Alignment*, this was a final order because it was "the order by which the district court disassociated itself from the case." 953 F.3d at 725. It "ended the litigation on the merits and left nothing more for the court to do but execute the judgment." *Id.* Plaintiff's notice of appeal designated that final order and the final judgment entered by the clerk. Doc. 85 ("Notice is hereby given that Plaintiff appeals to the United States Court of Appeals for the Eleventh Circuit from the final order (Doc. 83) and judgment (Doc. 84) of the District Court entered in this action on September 16, 2024."). Plaintiff's appeal encompasses "the undesignated interlocutory order that

dismissed [the other defendants] because that order was a step towards the final judgment into which it merged." *Auto Alignment*, 953 F.3d at 725.

Even if this Court had not disavowed *Osterneck*, that decision would not have survived the 2021 amendments to Rule 3. *See Phillips*, 2024 U.S. App. LEXIS 6629, at \*5 (noting that the 2021 amendments superseded *Osterneck*). For example, *Osterneck* held that, "where some portions of a judgment and some orders are expressly made part of the appeal, we must infer that the appellant did not intend to appeal other unmentioned orders or judgments." 825 F.2d at 1529. But the 2021 amendments to Rule 3 require the opposite inference, providing that "specific designations do not limit the scope of the notice of appeal" unless the appellant expressly states that such limitation is intended. Fed. R. App. P. 3(c)(6); *see also United States v. Alston*, No. 21-12077, 2022 U.S. App. LEXIS 6315, at \*4-5 (11th Cir. Mar. 9, 2022) ("Without an express statement limiting an appeal to a part of an order, specific designations do not limit the scope of the notice of appeal.").

Likewise, *Osterneck* held that a notice of appeal will not be construed "to include judgments and orders not specified unless the overriding intent to appeal these orders is readily apparent on the face of the notice." 825 F.2d at 1529. Amended Rule 3, however, provides that "[t]he notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order," and makes clear that "[i]t is not necessary to designate those orders in the

notice of appeal." Fed. R. App. P. 3(c)(4). "Thus, under the current version of the rule, a party need not designate all orders he seeks to appeal in his notice of appeal." *Jenkins v. Woodard*, 109 F.4th 242, 246-47 (4th Cir. 2024).

In fact, in a civil case, a notice of appeal need not even designate the final judgment (which Appellant did), provided it designates "an order that adjudicates all remaining claims and the rights and liabilities of all remaining parties" (which Appellant also did). Fed. R. App. P. 3(c)(5). Once that is done, the appeal encompasses all of the orders that led to the final judgment under the merger rule of Rule 3(c)(4). *Gen. Star Indem. Co.*, 855 F. App'x 599, 602.

Despite being killed twice, *Osterneck* has haunted a couple of this Court's unpublished opinions, but they are not persuasive. In *Vera v. Mkt. Wood LLC*, No. 22-14088, 2023 U.S. App. LEXIS 12707 (11th Cir. May 23, 2023), which Defendants cite, the panel addressed scope-of-appeal issues only in a footnote; cited only *Osterneck*; and did not consider *Auto Alignment* or the 2021 amendments to Rule 3. The same is true of *Amiri v. Gupta*, No. 21-13301, 2022 U.S. App. LEXIS 24293, at *3 (11th Cir. Aug. 29, 2022), which Defendants also cite. In fact, *Amiri* also cites (as do Defendants) to *Moton v. Cowart*, 631 F.3d 1337, 1341 n.2 (11th Cir. 2011), without noting that this Court expressly overruled *Moton* in the *Auto Alignment* decision. *See Auto Alignment*, 953 F.3d 707, 724 (holding that *Moton*

should not be followed because it was inconsistent with prior binding precedent). The Court can and should disregard these incorrect opinions.

As the Supreme Court held in *Foman v. Davis*, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962):

> It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. 'The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.'

*Id.* at 181-182, 83 S. Ct. at 229-230 (quoting *Conley v. Gibson*, 355 U.S. 41, 48, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957)). This Court should reject Defendants' baseless jurisdictional arguments and proceed to the merits of Plaintiff's appeal.

## II.     Plaintiff's ADA claims against DeKalb County should be upheld.

In its strained effort to defeat Plaintiff's claims under the ADA, DeKalb County is not content to distort this Court's prior decisions, but goes further and asks this Court to abandon them and join the Fifth Circuit on the wrong side of a circuit split. This Court should decline.

### A.     Title II applies to DeKalb County's medical response.

Title II of the ADA provides that a "qualified individual with a disability" shall not be "denied the benefits of the services, programs, or activities of a public entity," or "subjected to discrimination by any such entity." 42 U.S.C. § 12132. This standard applies to everything that a public entity does. Congress expressly defined

the term "[p]rogram or activity" in Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (29 U.S.C. 701 *et seq.*), which served as the model for Title II, to "mean[] all of the operations of " a covered entity. 29 U.S.C. 794(b). Because Congress directed that Title II should not "be construed to apply a lesser standard than the standards applied under" Section 504, 42 U.S.C. 12201(a), the phrase "service, programs, or activities" carries a similarly broad meaning under the ADA. See *Bragdon* v. *Abbott*, 524 U.S. 624, 631-632 (1998) (holding that courts are "require[d] to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act").

Department of Justice regulations under Title II — whose validity DeKalb does not challenge here — require a public entity to make reasonable accommodations for a person's disability. *See Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1082 n.13 (11th Cir. 2007); *see also Alexander v. Choate*, 469 U.S. 287, 301, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) ("reasonable accommodations . . . may have to be made" in order to ensure meaningful access to the benefits of public programs).

DeKalb attempts to argue that "Title II does not apply to first responders' encounters with disabled individuals that occur in exigent circumstances." DeKalb EE Br., p. 12. But DeKalb makes no effort whatsoever to ground its argument in the

statute's text, nor can it point to any circuit that has ever adopted such a sweeping exclusion from the ADA. The argument should be rejected.

DeKalb argues that it is an open question in this Circuit "whether police officers can violate Title II of the ADA," and asks this Court to hold that they cannot. DeKalb EE Br., p. 12. But this case presents no occasion to consider whether Title II applies to arrests. Despite DeKalb's conflation of police and emergency medical personnel into a vague category of "first responders," the Court should keep firmly in mind that this case involves a medical response, not a criminal arrest. Jamon's disability was the whole reason DeKalb responded to the scene at all: Ms. West's 9-1-1 call did not report any crime, but sought help for her son's seizure disorder. (Doc. 28, ¶¶ 21-22.) DeKalb County Fire Rescue was first to the scene, and Plaintiff alleges that Captain Ditmore remained in command throughout the incident, even after police arrived. (*Id.*, ¶¶ 34-35, 40-41, 84-85, 100.) It is clear that a public entity's provision of medical services is a "service, program, or activity" that is subject to Title II. *U.S. v. Georgia*, 546 U.S. 151, 157 (2006).

DeKalb does not seriously dispute that its 9-1-1 emergency medical response service is a "service, program, or activity" of a "public entity." It does make a weak argument that "performing community caretaker functions in exigent circumstances is not something . . . from which there may be a 'benefit'"; but of course the whole reason why such functions are performed is to provide a benefit. Emergency medical

personnel do not respond to a 9-1-1 call to leave people worse off, or just leave them as they are. They are supposed to help. That is a benefit. DeKalb's argument might sound more sensible as applied to an arrest, but even then, it would run up against the Supreme Court's holding that the ADA covers prisoners. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211, 118 S. Ct. 1952, 1955, 141 L.Ed.2d 215, 220 (1998) (holding that an incarcerated person may be a "qualified individual with a disability" and that "the words [of the ADA's definition] do not connote voluntariness").

DeKalb asks this Court to follow the Fifth Circuit's isolated minority decision in *Hainze v. Richards*, 207 F.3d 795 (2000), which held that Title II does not apply to a police officer's on-the-street response until after the officer has secured the scene and ensured that there is no threat to human life. *Hainze*, 207 F.3d at 801. No other circuit — including this one — has deemed the Fifth Circuit's approach proper. As this Court held in *Bircoll*, "[t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." 480 F.3d 1072, 1085; *see also Seremeth v. Bd. of Cty. Comm'rs*, 673 F.3d 333, 339 (4th Cir. 2012) (noting that "nothing in the text of the ADA suggests that a separate exigent-circumstances inquiry is appropriate" in determining whether the ADA applies); *Sheehan v. City and Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) ("[W]e agree with the Eleventh and Fourth Circuits that exigent

circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment.").

Even if this Court were to adopt the *Hainze* approach, and were to extend it beyond law-enforcement to cover emergency medical responses, it would not bar Plaintiff's claims. Under *Hainze*, once the scene is secure and no threat to human life exists, the ADA **does** apply, and police must make reasonable modifications to accommodate an individual's disability. *Hainze*, 207 F.3d at 802; *Windham v. Harris Cty.*, 875 F.3d 229, 237-38 (5th Cir. 2017). Plaintiff alleges that Defendants chose to keep Jamon restrained face down on the ground, with hands cuffed behind the back, **after** he was subdued, when it would not have posed a significant danger to anyone to modify his restraint for his safety. (*Id.*, ¶¶ 118-22, 124.) The Court must credit these allegations, and construe them in Plaintiff's favor, on DeKalb's motion to dismiss. Assuming that any exigent circumstances were under control, as Plaintiff alleges, even the *Hainze* approach requires reasonable disability accommodations to be made.

DeKalb therefore asks this Court to go even further than *Hainze*, and hold "that to the extent police are required, at some point, to accommodate a disability, that point is not before arrival at the police station." DeKalb EE Br., p. 14. The text of the ADA provides no basis for a court to impose such a categorical, made-up rule, and DeKalb does not even bother to argue that it does. And such a rule would not

make sense, given that many disabilities — mobility impairments, for instance — might need to be accommodated **during** transport to the police station. Besides, DeKalb's proposed rule would have no application here, because Jamon West was not suspected of any crime and was headed to the hospital, not to a police station.

**B.      DeKalb is liable for Ditmore's deliberate indifference under *Liese*.**

Disregarding Plaintiff's allegations that Capt. Ditmore was the commanding officer at the scene, giving orders to subordinate representatives of two County agencies that resulted in the restraint and forcible medication of a DeKalb County citizen, DeKalb argues that he really had no more decision-making authority than a bus driver. DeKalb EE Br., pp. 23-24 (citing *Silberman v. Miami-Dade Transit*, 927 F.3d 1123, 1135 (11th Cir. 2019)). This is nonsense.

For purposes of entity liability under the ADA, "an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012). DeKalb latches onto the phrase, "administrative process," and insists that it means an "official" must play the role of reviewing other people's decisions to "correct discrimination," rather than dealing directly with the person who needs accommodations for a disability. DeKalb EE Br., pp. 23-24. That argument ignores this Court's statement in *Liese* that the relevant

"official" is someone who has discretion "when dealing with the complainant." 701 F.3d 334, 350. This Court specifically held that an "official" **need not** be a high-level policymaker, because "[e]ntities regularly undertake a myriad of official actions that do not involve policymaking." *Id.* at 349-50.

Thus, the relevant "officials" in *Liese* were doctors; and in the related case of *Sunderland v. Bethesda Hosp., Inc.*, the "officials" were nurses who had sufficient "supervisory authority" under their hospital's chain of command to make decisions regarding whether persons with hearing impairment received in-person interpreters. 686 F. App'x 807, 816 (11th Cir. 2017). The bus drivers in *Silberman* did not qualify as "officials" because they lacked any "substantial supervisory authority" and were merely what this Court referred to as "line employees." 927 F.3d 1123, 1135; See also *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1255 (11th Cir. 2010) (holding that a "janitorial supervisor was plainly not high enough up the chain-of-command" to be an "official"). A captain in a fire department, who has authority to give orders to subordinates from two agencies, plainly has the supervisory authority that a bus driver or janitorial supervisor lacks — or at least, so a jury could find. Plaintiff's allegations should be credited on this issue.

**C.    Plaintiff alleges that Ditmore was deliberately indifferent.**

The deliberate indifference standard requires Plaintiff to plead that Ditmore (1) had actual knowledge of the need for accommodations, and (2) made a deliberate

choice not to take any action despite that notice. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998); *Favors v. City of Atlanta*, 849 Fed. Appx. 813 (2021). Plaintiff's allegations easily surpass this standard.

First, a jury could infer that Ditmore had actual knowledge that Jamon West was in a state of excited delirium which called for modified restraint procedures. Plaintiff directly alleges such knowledge. Doc. 28, ¶¶ 86-88, 90-91, 99. And this allegation is factually plausible. As the Supreme Court held in *Farmer v. Brennan*, whether an official has knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . .." 511 U.S. 825, 842-843 (1994).

Plaintiff alleges an abundance of circumstantial facts to support such an inference. For example, Plaintiff alleges that Capt. Ditmore's job description gave him authority and discretion to make accommodations for disabilities in these circumstances, which supports an inference that he possessed the knowledge he would need to do that job. Doc. 28, ¶ 102. The written policy manual that governed Ditmore's performance of his duties expressly discusses the need for accommodations for excited delirium, specifically avoiding prone restraint. *Id.*, ¶ 68. It is fair to infer that Capt. Ditmore's job required him to know what was in his own department's policy manual. In addition, Plaintiff alleges that the link between excited delirium, prone restraint, and cardiorespiratory arrest is well known and that

law-enforcement and emergency-medical authorities have warned of it for decades. Doc. 28, ¶¶ 25-27. It is reasonable to infer that Captain Ditmore knew a fact that is well known and discussed by authorities in his field of employment.

A jury also could find that Ditmore made a deliberate choice not to take any action to accommodate Jamon. Plaintiff alleges, and DeKalb does not dispute, that Ditmore knowingly permitted Jamon to be restrained in a prone position with hands cuffed behind his back and people sitting on him. Doc. 28, ¶¶ 28-31. Ditmore ordered Jamon to be given drugs that **increased** his risk of respiratory failure, and helped the police officers handcuff Jamon behind his back. *Id.*, ¶¶ 35-42. Rather than order the officers to roll Jamon into a seated or side-lying position to take pressure off of his heart and lungs, Ditmore walked away and made a radio call. *Id.*, ¶¶ 44-47. That qualifies as deliberate indifference, assuming that Ditmore knew that prone restraint was dangerous for a person in Jamon's condition and that a positional modification would alleviate the unnecessary risk of harm.

Defendants choose to mischaracterize Plaintiff's allegations, framing cherry-picked phrases with tendentious language of their own to suggest that Ditmore only left Jamon restrained for a short and reasonable period of time. But Plaintiff does not allege the quantitative duration of Defendants' prone restraint, nor that it lasted only for a reasonable length of time. In fact, Plaintiff expressly alleges that the Defendants continued to apply prone restraint after any need for such force no longer existed;

that Jamon suffered cardiorespiratory arrest as a direct and proximate result; and that DeKalb's Medical Examiner found that the restraint constituted "homicide." (Doc. 28, ¶¶ 55-56, 124-25.) Defendants' argument ignores the requirement to take these allegations as true and make all reasonable constructions and inferences from the allegations in Plaintiff's favor. This Court should decline to construe the allegations of Plaintiff's pleading in a manner that serves only Defendant.

### D. Plaintiff's proposed accommodations are reasonable, or so a jury could find after being properly informed by expert testimony.

Defendants ask this Court to find, as a matter of law, that accommodations are unreasonable which — as Plaintiff alleges — are recommended by the United States Department of Justice[1] and by the National Association of EMS Physicians, and have been adopted by numerous agencies across the country. (Doc. 28, ¶¶ 26-27, 61, 67, 70, 74, 106.) To be clear, Plaintiff is not asking the court to rewrite DeKalb's policy manuals, impose these accommodations as a matter of law, or even hold (at this stage) that they would have been reasonable in the circumstances. It is DeKalb that is asking this Court to judge the accommodations' reasonableness as a matter of law. Plaintiff disagrees. These fact-intensive questions should be answered on a

---

[1] *See* "Positional Asphyxia — Sudden Death" (Nat'l Law Enf. Tech. Center, June 1995), https://www.ojp.gov/pdffiles/posasph.pdf (last viewed May 14, 2025). This Court may consider the DOJ publication under the incorporation-by-reference doctrine, since it is expressly referred to in Plaintiff's Complaint and its authenticity is not subject to reasonable dispute. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024).

fuller record, with video of the incident and the benefit of expert discovery. All Plaintiff is asking here is for the Court to construe the allegations of the Amended Complaint in her favor and allow the case to proceed past a motion to dismiss.

**E.    Alternatively, DeKalb is a liable for the deliberate indifference of its high-level policymakers.**

Plaintiff has alleged, and a jury could find, that DeKalb policymakers knew of the risk of death when a patient with excited delirium is subjected to prone restraint. *See* Doc. 28, ¶ 62 (alleging that the Police Chief and Fire Chief "had actual knowledge at all relevant times that excited delirium is associated with an increased risk of death in custody, and that ordinary restraint procedures must be modified when a subject has excited delirium in order to avoid creating an unreasonable risk of death"); *id.* at ¶ 107 ("At all relevant times, DeKalb County's relevant policymakers, including its Chief of Police and its Fire Chief, had actual knowledge that prone restraint and behind-the-back handcuffing create an increased risk of in-custody death for subjects with excited delirium."). The allegation that they had such knowledge is plausible because, among other things, these officials adopted actual policies regarding excited delirium. *Id.*, ¶ 63. Also supporting the inference of such knowledge is the fact that excited delirium is a "well-recognized condition" that governmental agencies around the country have adopted policies to address. *Id.*, ¶ 61. It is fair to infer that DeKalb's officials have the same general knowledge that their peers at other agencies have.

Plaintiff also plausibly alleges that DeKalb's policymakers did not take any reasonable action in response to their knowledge of this risk. DKPD, according to Plaintiff's allegations, did not train its officers on the dangers of improper restraint of persons with excited delirium, and did not advise them of those dangers in its use-of-force policy, which addressed excited delirium only in the section on Tasers. *Id.*, ¶ 108, 65. DKPD also did not prohibit prone restraint or behind-the-back cuffing of persons with excited delirium. *Id.*, ¶¶ 69, 72. (DCFR's written policy appears on its face to prohibit these restraint methods, but that is illusory, since DeKalb specifically ratified Ditmore's use of those methods here and found that they did **not** violate policy. *Id.*, ¶ 79.) And neither DKPD nor DCFR required that persons with excited delirium be placed into a side-lying or seated position after being restrained, to facilitate proper breathing and prevent cardiac arrest. *Id.*, ¶ 73. These facts do not add up to a meaningful response, given the known risk that improper methods may (as they did here) cause the death of an innocent person.

## III. Plaintiff also pleads valid claims under Section 1983.

### A. Plaintiff alleged valid claims for excessive force.

Defendants' rebuttal of Plaintiff's claims for excessive force depends on a misstatement of the facts alleged in the Amended Complaint. Defendants suggest that they restrained him only "until the sedative took effect" and that "they replaced his handcuffs with soft restraints once Jamon had calmed." DeKalb EE Br., p. 28.

But that is not a fair description of Plaintiff's allegations. Plaintiff has not alleged the precise duration of the restraint, because Plaintiff does not have the video of the incident (which DeKalb tellingly has not opted to place in the record). But the restraint clearly was long enough to be fatal, because DeKalb's own Medical Examiner found the cause of death to be "homicide." Doc. 28, ¶ 56. And Plaintiff alleges that "[t]he Excessive Force Defendants unreasonably continued to apply deadly force to Jamon West after any possible need for such force no longer existed." Doc. 28, ¶ 124. Applying force when it is no longer necessary is a violation of clearly established law. *Skrtich v. Thornton*, 280 F.3d 1295, 1303-04 (11th Cir. 2002).

The 1996 quorum decision of Judges Carnes and Tjoflat in *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir. 1996), does not establish that Defendants here are entitled to qualified immunity. The *Cottrell* decision involved two officers who restrained a man who was having a mental crisis and then improperly positioned him in the squad car during transport, where he died of positional asphyxia. 85 F.3d 1480, 1488. There was no allegation that the man was "was restrained face down on the ground, with four or five firefighters applying force to all four extremities and to his back," as Jamon West was here, or that multiple officers continued to forcibly restrain him face-down on the ground even after he was subdued, as the officers did here. Doc. 28, ¶¶ 30-50. The Court in *Cottrell* granted summary judgment to the two officers, but the basis for the decision is not explained beyond the general conclusory

statement that "there is no genuine issue of material fact concerning excessive force in this case, and the defendant officers are entitled to summary judgment as a matter of law." 85 F.3d at 1492. It seems likely that the Court found the arrestee's death to have resulted from negligent positioning within the vehicle, and not from an intentional use of force by the officers.

In *Garrett v. Athens-Clarke County*, a man named Irby "led [police] on a highspeed chase at speeds of up to 75 miles per hour" for some 30 miles. 378 F.3d 1274, 1276 (2004). When they finally caught Irby, he violently resisted arrest, ramming an officer's patrol car with his truck and wresting away one of their guns. *Id.* He then ran away and had to be physically subdued, yelling that the officers "were going to have to kill him to take him." *Id.* at 1277-78. More officers arrived, and they managed to immobilize Irby with a "hobble cord" which strapped his legs and arms together behind him. *Id.* at 1278. When the ambulance arrived, Irby had died of "positional asphyxia," complicated by the presence of both methamphetamine and amphetamine in his system. *Id.* It is hardly surprising that this Court found that the use of the hobble cord on Irby was "within the range of reasonably proportionate responses to the need for force," 378 F.3d at 1280, since there were several points in the encounter where the officers could constitutionally have shot him dead.

Defendants' reliance on *Cottrell* and *Garrett* is curious, given their contention that they needed court decisions to tell them whether improper positioning of Jamon

West carried a risk of death. After all, both of these cases concern men who died of positional asphyxia in police custody after being restrained in a prone position. To the extent that Defendants really need courts to inform them of this risk — rather than, say, learning it from the DCFR policy manual, or from published guidance of the United States Department of Justice — these two cases clearly provide that information. The fact that the officers there were not held civilly liable for causing the subjects' deaths does not mean that their methods did not increase the risk of that result.

Decades-old decisions such as these should not be permitted to freeze our expectations of law-enforcement practices for all time, as Defendants would have it, or justify agencies in their failure to incorporate evolving knowledge and standards. It is worth noting that the plaintiff's expert in *Cottrell* averred in his affidavit that the officers violated the prevailing standards of law enforcement in their restraint and transport of that arrestee in **1990.** 85 F.3d at 1488. The Department of Justice guidance regarding prone restraint and excited delirium came out in **1995.** Doc. 28, ¶¶ 26, 106. The incident involving Jamon West occurred on **August 16, 2019**. Doc. 28, ¶ 19. Defendants may be right that officials "are not obligated to be imaginative or draw analogies from cases," DeKalb EE Br. at 31, but a period of decades is more than enough time to expect them to learn widely available facts, published by major

authorities in their field, that may make the difference between life and death to the people they serve.

In addition, the Court should note that both *Garrett* and *Cottrell* were appeals from the denial of summary judgment. *Garrett*, 378 F.3d at 1275; *Cottrell*, 85 F.3d at 1484. That is, the plaintiffs in both of those cases were permitted discovery and a chance to develop a record of expert testimony. Plaintiff asks no more than that.

**B.** **Plaintiff alleges valid claims against Payne and Ditmore for deliberate indifference to medical needs.**

Plaintiff's claim for deliberate indifference to medical needs against Capt. Ditmore and Firefighter Payne also should survive dismissal. Plaintiff alleges that these DCFR officers knew what the other officers knew: that Jamon was suffering from excited delirium, and that his condition carried a heightened risk of death due to prone restraint with hands cuffed behind the back. In addition, however, Payne and Ditmore had knowledge the other officers may have lacked, which was that Payne — at Ditmore's direction — had injected into Jamon's veins the maximum dose of two central nervous system depressants, which would further increase his risk of respiratory depression (inability to breathe). Doc. 28, ¶¶ 35-38, 92, 128-135. Despite this knowledge, neither took the steps medically necessary to mitigate his known risk of death. *Id.*, ¶¶ 136-37. They did not change the manner of his restraint, nor did they tell anyone that it should be changed, so that Jamon could breathe. *Id.* As a result, Jamon died. *Id.*, ¶ 138. These facts satisfy the deliberate-indifference

standard. *See Wade v. Daniels,* 36 F.4th 1318, 1327 (11th Cir. 2022) (four-minute delay in calling for life-saving medical aid constituted deliberate indifference); *Valderrama v. Rousseau*, 780 F.3d 1108, 1117 (11th Cir. 2015) (three-and-a-half-minute delay); *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (fourteen-minute delay).

Defendants do not appear to dispute that Plaintiff's allegations meet the standard for deliberate indifference; instead, they argue that there is no "bright-line rule," and that Plaintiff "fails to point to any case law that would provide notice to Ditmore and Payne that they violated Mr. West's constitutional rights; instead, West again cites to an internal policy." DCFR EE Br., pp. 31-32. But the Supreme Court has expressly held that "departmental instructions and other well-known police guidance" may suffice to inform an officer that his conduct is unlawful in the circumstances. *Lombardo* v. *City of St. Louis*, 141 S. Ct. 2239, 2241; 210 L.Ed.2d 609 (2021). The guidance in *Lombardo* was the Department of Justice publication "recommending that officers get a subject off his stomach as soon as he is handcuffed" because of the risk of death. *Id.* That same publication, and DCFR policy, also informed Payne and Ditmore of what they needed to do to keep Jamon West from dying due to improper restraint. They just did not do it.

### C. Plaintiff sufficiently pleads *Monell* claims against DeKalb.

Defendant does not claim that it trained any of its firefighters or police officers regarding the risks of improper restraint of persons with excited delirium. Instead, it argues that there is no basis to impute to DeKalb's policymakers a knowledge that such training was needed. But as demonstrated above in Plaintiff's discussion of deliberate indifference, DeKalb's own policies reflect **actual knowledge** on the part of County policymakers that improper restraint of persons with excited delirium may lead to respiratory depression and cardiac arrest. The United States Department of Justice has issued guidance to law enforcement agencies on this topic for thirty years. That guidance reflects that the New York Police Department has made a training video on the subject available to other law-enforcement agencies for the same thirty-year period. These facts make plausible Plaintiff's express allegation that DeKalb's policymakers knew of the need to train DeKalb's responders on this subject in 2019, just as DOJ and the NYPD knew of that need in 1995. Instead, DeKalb did not properly train its officers, with the result that twelve of them, working together, used improper restraint techniques that killed Jamon West. These facts state a *Monell* claim for failure to train.

### CONCLUSION

This Court should reject Defendant's arguments and reverse the lower court.

Respectfully submitted, this 14th day of May, 2025.

s/ Leighton Moore
Leighton Moore
Georgia Bar No. 520701
THE MOORE LAW FIRM, P.C.
1819 Peachtree Street NE
Suite 403
Atlanta, GA 30309
Phone: 404-285-5724
leighton@moorefirmpc.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Brief was prepared using Microsoft Word for Mac 2021 and is set in Times New Roman 14 pt. font. According to the word-count tool provided with the software, the relevant body of the brief contains 6,448 words.

This 14th day of May, 2025.

*s/ Leighton Moore*
Leighton Moore

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served opposing counsel with a copy of the foregoing Reply Brief of Appellant, by filing same with the Court's CM-ECF Appellate system, which will cause a copy of the filed document to be delivered electronically to counsel for Appellants. Service copies also have been delivered electronically by agreement of counsel.

This 14th day of May, 2025.

*s/ Leighton Moore*
Leighton Moore